[Cite as *In re S.M.*, 2024-Ohio-992.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re S.M.

Court of Appeals No.  H-23-026

Trial Court No.  DNA 2022 00006

**DECISION AND JUDGMENT**

Decided:  March 15, 2024

* * * * *

Richard H. Palau, for appellee.

Miles T. Mull, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal from the September 20, 2023 judgment of the Huron County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, T.M., the mother of minor child, S.M. ("SM"), and granting permanent custody of the child to appellee, Huron County Department of Job and Family Services ("the agency").  For the reasons that follow, we affirm the judgment.

**{¶ 2}** Mother sets forth one assignment of error:

The trial court's decision to terminate parental rights and responsibilities was not supported by clear and convincing evidence, being against the manifest weight of evidence presented at trial.

## Background

**{¶ 3}** SM was born in July 2016, to mother and father, L.M. SM lived with mother, an older half-sibling ("sibling"),[1] maternal great-grandmother ("GG") and other extended family members. In 2018, GG became the legal custodian of the children because mother was in prison. The family home where the children and others lived was unsanitary and cluttered, and the children were not attending school.

### Agency's Complaints

**{¶ 4}** On January 20, 2022, the agency filed complaints alleging the children were dependent. The complaint regarding SM indicated that in December 2021, the agency became involved due to concerns of dependency regarding GG's ability to care for SM. GG had been admitted to a mental health facility due to her difficulty managing SM's behaviors, as caring for SM impacted GG's mental health. The complaint further set forth that in early January 2022, GG was hospitalized due to physical health issues, GG

---

[1] Sibling has a different father than SM. Sibling is not the subject of this appeal, but certain information about sibling is relevant and significant to SM and this appeal. Our reference to "children" includes both SM and sibling.

2.

was then admitted to a skilled nursing facility, and it was unknown when she could go home. It was alleged that GG was unable to care for SM.

**Hearing**

{¶ 5} Also on January 20, 2022, a shelter care hearing was held. The agency was granted temporary custody of the children and they were placed in a foster home. Shortly thereafter, the court assigned a guardian ad litem ("GAL") for the children.

**First Case Plan**

{¶ 6} On March 1, 2022, a family case plan was filed. Parties to the plan were SM, mother, sibling and sibling's father, and four concerns were set forth: sibling was missing school and acting aggressively towards family members; household environmental hazards were present where mother lived, including garbage in and around the house; SM was not attending school due to mother's struggle to redirect sibling's undesired behavior; and sibling's father desires to have a relationship with sibling, but sibling does not want to have contact with his father. Services to alleviate these concerns included mother: undergoing a mental health assessment and following all recommendations; attending parenting classes; and, having supervised visits with the children.

**Legal Custody Motions**

{¶ 7} On March 10, 2022, sibling's father filed a motion for legal custody of the children. Thereafter, motions for legal custody of the children were filed by maternal grandmother ("MG"), maternal uncle and mother.

3.

**Hearing**

{¶ 8} On April 7, 2022, the adjudication hearing was held and the court found the children were dependent.

**GAL Report**

{¶ 9} On April 8, 2022, the GAL filed her report for the upcoming dispositional hearing and pretrial on the motions for legal custody. The report set forth, inter alia: the children were in the same foster home, they were in mental health counseling and attended school regularly; mother visited with the children one day per week; mother lived in a three-bedroom house rented by her aunt and aunt's fiancé, who both lived there along with MG and GG; mother recognized the house needed to be more orderly and clean; mother had no job or income, she was a felon and her driver's license was suspended due to an OVI in 2021; and, SM had no contact with her father since she was one year old. The GAL recommended the agency's temporary custody of the children continue.

**Hearing and Visits**

{¶ 10} On April 11, 2022, the dispositional hearing and initial pretrial on the motions for legal custody were held. The court found there were no appropriate relatives willing to be temporary custodians of the children, and ordered their placement with the agency continue. In addition, the court ordered mother to do the following: submit to a mental health assessment and actively participate in and successfully complete all recommended treatment; actively participate and successfully complete family

4.

counseling with the children; actively participate and successfully complete a parenting education program approved by the agency; and, obtain and maintain employment.

{¶ 11} Thereafter, visitation recommendations were filed. Mother recommended that the court expand her visits with the children to include unsupervised visits, since she made progress in her case plan goals, as she was actively engaged in counseling and visits with the children, she had nearly completed parenting classes, and was seeking a job. The agency's recommendations practically mirrored those of mother, and included that mother made progress cleaning and decluttering common areas of the home and that mother be allowed unsupervised visits starting with two hours a week, but not at her home. The GAL concurred with the agency's recommendations that mother be allowed unsupervised visits starting with two hours a week and not at her home.

{¶ 12} On May 13, 2022, the court ordered that mother may have unsupervised visits with the children up to two hours a week in a public place approved by the agency.

**GAL Report**

{¶ 13} On June 21, 2022, the GAL filed a report regarding the pending motions for legal custody, which provided, inter alia: the children were in the same foster home; following assessments, neither child needed mental health services; mother had weekly supervised visits with the children; sibling's father had unsupervised visits with the children and in May 2022, started overnight visits with them; SM attended two overnight visits, but sibling's father found SM required too much of his attention such that his time with sibling was compromised; he and his fiancée were alarmed at SM's sexualized play,

5.

so SM did not attend further overnight visits; sibling was accused by another child in the foster home of attempting to have inappropriate contact; sibling was placed with his father; SM had to repeat kindergarten and had tooth decay, so the foster parents had to pursue dental care; mental health services for SM also had to be pursued, despite the assessment indicating none were needed; mother lived in the same house with three other adults; GG passed away June 14, 2022; GG had owned the only working car; numerous dogs and cats were still in the house; mother had no job and had to attend a three-day drug and alcohol seminar for her OVI conviction; she had no driver's license; her mental health services were discontinued due to no calls-no shows; she completed four out of eleven parenting classes; she attended all available visits with the children, which went fairly well; SM was reeling over her sibling leaving the foster home; mother's home environment was the same; mother had reported that when SM lived with her, SM was often sick and could not attend school; SM was sick one time in the foster home; and, the GAL asked mother about raunchy material seen by SM on the phone mother gave her to use before she went to the foster home and mother said she used safety apps on the phone but a relative removed the apps when SM cried about not being able to access horror shows. The GAL did not see mother prepared to safely parent SM, and recommended the agency's temporary custody continue, and mother engage in mental health counseling, finish parenting classes and get a job.

**Hearing**

{¶ 14} On July 12, 2022, a hearing was held on the motions for legal custody. The uncle did not appear at the hearing so the court dismissed his motion for want of prosecution. Thereafter, all of the remaining motions were withdrawn by the movants.

**Amended Case Plan and Visits**

{¶ 15} On July 21, 2022, an amended case plan for SM and mother was filed, with two concerns: household environmental hazards, including garbage in and around the house; and, mother's substance abuse, as she tested positive for methamphetamines ("meth") and THC.[2] Services to alleviate these concerns included: mother schedule substance use and mental health assessments and follow all recommendations; the caseworker assist the family in acquiring materials to keep the house clean and safe (the agency had previously offered vouchers to the family to start the cleaning process); mother be open and honest with treatment providers and the agency; and, mother submit to random drug screens requested by the agency, GAL and treatment providers.

{¶ 16} Thereafter, visitation recommendations were filed. Mother recommended that her visits with the children remain the same as previously ordered, since she completed parenting classes, reinitiated counseling and attended all sessions, and "is voluntarily submitting to a substance abuse screen and will comply with any

---

[2] THC is a psychoactive component of marijuana. *See State v. Alexander*, 6th Dist. Lucas No. L-21-1129, 2022-Ohio-2430, ¶ 6.

7.

recommended treatment." The agency recommended that mother have only supervised visits with the children. The GAL recommended that mother have only supervised visits with the children until she successfully completed six weeks of substance abuse counseling and had at least six consecutive weeks of clean drug screens.

{¶ 17} On August 5, 2022, the court ordered that mother only have supervised visits with the children. The court further ordered that once mother completed a minimum of six weeks of substance abuse counseling and had a minimum of six consecutive weeks of clean substance abuse screens, she may file a motion for increased visitation.

**GAL Report**

{¶ 18} On November 28, 2022, the GAL filed a report for the approaching dispositional hearing, which provided, inter alia: due to allegations that SM was exposed to sexual behavior by sibling, or generally while in mother's home, SM participated in mental health sessions with a therapist, which went well and no more concerns were raised; SM had no behavioral issues at school or the foster house; SM had to repeat kindergarten due to the amount of school she had previously missed; SM still had tooth decay ; the foster parents recently found a provider who took SM's Medicaid, so dental treatment started in October 2022; mother lived in the same house with three other adults; the GAL went to the family house September 1, 2022, for an unannounced visit, and heard voices inside, but no one answered the door; the GAL saw mother after mother's visits with SM due to the continued bug infestation at the house and mother's positive

8.

drug screens; mother had no income, no job and no driver's license; mother said she was supported by her fiancé and they had a place to live; the GAL asked mother three times to arrange a background check of her fiancé, but mother made no arrangements; mother participated in mental health services over the phone; the agency recommended that mother attend in-person sessions due to her positive drug screens, but mother refused; mother's last two drugs screens were extremely high for meth; SM expressed a desire to return to mother; and, due to mother's lack of progress, there was an effort to locate a possible adoptive home for SM. The GAL's recommendations included: SM remain in the agency's temporary custody; and, mother engage in and complete counseling, provide drug screens when requested and get a job so she has adequate income for her family.

**Hearing and Placement Change**

{¶ 19} On December 8, 2022, a dispositional hearing was held, and the court extended the agency's temporary custody of SM for another six months, and ordered that mother have only supervised visits with SM.

{¶ 20} In December 2022, the agency filed a notice of placement change for SM, since her original placement was not able to provide permanency for SM, if needed.

**Semi-Annual Review Report and GAL Report**

{¶ 21} On February 27, 2023, the agency filed its semi-annual administrative review report, which set forth the same two concerns with mother noted in the amended case plan filed July 21, 2022.

9.

{¶ 22} On April 13, 2023, the GAL filed a report for the upcoming dispositional hearing which set forth, inter alia: SM had two dental surgeries to remove decayed teeth and to treat infection; SM received outstanding marks in almost every category at school; at SM's new foster home, she had her own room, she had two younger foster brothers who she enjoyed, she was responding well to her new foster parents, and appeared happy and confident; SM was in gymnastics over the winter and was playing T-ball in the spring; mother lived in the same house with her aunt, aunt's fiancé and GM, although GM reported that her fiancé and mother's fiancé also lived in the house; aunt and aunt's fiancé were relocating and told mother she had to leave the house eventually; mother indicated she and GM want to rent an apartment together; the GAL last visited the house on March 9, 2023, and saw mother's boyfriend[3] there, then he left and mother walked up and reported that the boyfriend lived at the VOA[4] in Mansfield; the house still had a visible bug problem, but the hole in the bathroom floor was patched and the living room was decluttered; mother enrolled in counseling; IOP (intensive outpatient program) was recommended, but mother refused; her February 2023 drug screen was positive for meth, amphetamines ("amphet")[5] and THC; her March 9, 2023 drug screen was positive for

---

[3] The record refers to mother's fiancé and boyfriend; the record is not clear as to his true status.

[4] There is no indication in the record what this is.

[5] Meth is converted by the body into amphet. *See In re B.M.*, 6th Dist. Williams No. WM-23-008, 2024-Ohio-111, ¶ 6.

meth; mother reported she did not believe her mental health was good because it was hard for her to get out of bed; she was still unemployed; she visited with SM weekly for an hour and the visits went well; and, SM continued to express a desire to return to mother's house. The GAL's recommendations included: SM remain in the agency's temporary custody; mother engage in and complete counseling; mother participate in IOP as recommended by her counselor; mother provide drug screens when requested; and, mother find a full-time job so she has adequate income for the family.

**Hearing**

{¶ 23} On April 27, 2023, a dispositional hearing was held. The court extended the agency's temporary custody of SM for another six months and ordered, inter alia, that mother have only supervised visits with SM.

**Motion for Permanent Custody**

{¶ 24} On June 7, 2023, the agency filed a motion for permanent custody of SM pursuant to R.C. 2151.413(A) and (D)(1) and R.C. 2151.414(B). The agency asserted SM had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period, and SM cannot or should not be placed with either parent within a reasonable time. The agency detailed certain circumstances in support of its motion, some of which are summarized as follows.

*GG and Family Home*

{¶ 25} In or about December 2021, GG was ordered to appear for a truancy hearing for the children. At the hearing, GG said SM missed school because SM was

sick; GG pled guilty to the charges and testified in court that sibling was out of control and refused to do anything an adult told him to do. When GG got home from the hearing, she informed sibling that he had to go to school because the court ordered her to ensure he went to school, but sibling laughed, walked away and said he would rather be in DH[6] than go to school. This caused GG to have a mental health crisis, so she was taken to the local hospital's psychiatric ward.

{¶ 26} On December 22, 2021, a caseworker visited the family home and found excessive amounts of filth and grime in the kitchen - on the cabinets, floor and refrigerator - and large amounts of food and garbage on the floor of the house.

*Child Protective Services ("CPS") and the Agency's Involvement*

{¶ 27} Mother has been involved with CPS[7] since 2016, when she tested positive for a street drug in January, while pregnant with SM, and in July, a physical abuse report was made. In November 2017, while mother was incarcerated, there was a physical abuse report and neglect concerns involving SM. GG was supposed to care for SM, but she allowed a lady ("the lady") to move into the family home to watch SM; the lady took SM along when she bought "ICE," and the lady fell asleep in the car overnight with SM in the car. The lady also had SM around known drug users. SM had an unexplained bite mark on her breast and a bruise on her arm; neglect was substantiated with the lady as the

---

[6] There is no indication in the record what this is.

[7] This occurred in Scioto County, Ohio.

perpetrator, and physical abuse was indicated by an unknown perpetrator. According to the lady, her boyfriend was around SM and alone with SM for about 15 seconds. The boyfriend commented that SM was spoiled and interrupted his alone time with the lady.

{¶ 28} In February 2018, it was reported that GG was hospitalized due to suicidal statements. GG said the children were with mother, who GG believed was sober. GG also said mother met a man online and was trying to transport him so he could live with mother in the family home.

{¶ 29} In March 2021, a report was made regarding sibling missing school.

{¶ 30} In August 2021, the agency received a report of neglect and physical abuse of the children. There were concerns with the condition of the house and the children did not have their own beds.

{¶ 31} In September 2021, the agency received a neglect report regarding the children, as emergency responders were at the family home where there was dog feces throughout, the house smelled and the odor could be detected outside, and there was clutter. The children stayed with relatives for three days until the house was free from safety hazards. The family continued to work on cleaning the house, with supplies provided by the agency, and the cleanliness issues were resolved.

{¶ 32} At the time of trial mother had an open case in Franklin County, Ohio, concerning sibling as he sexually abused a child in his father's home in August 2022. Sibling had disclosed that he also sexually abused SM from the time she was born until a few months before the children were removed from the family home.

13.

*Mother and Father's Criminal Histories*

**{¶ 33}** Mother has a criminal record. In February 2014, she was charged with theft of an elderly or disabled adult and placed on probation. In September 2017, her probation was revoked due to a violation, and she was sentenced to 12 months in prison. In January and February 2019, she was charged with two separate counts of receiving stolen goods; those cases were dismissed or settled.

**{¶ 34}** In May 2019, mother was charged with aggravated possession of drugs (two counts), possession of criminal tools, and possession of drugs (two counts). She pled to one count of aggravated possession of drugs, the remaining chargers were dismissed and she was sentenced to 8 months incarceration.

**{¶ 35}** SM's father also has a criminal record.

*SM*

**{¶ 36}** SM was developmentally, physically, cognitively and socially on target according to records, although she struggled with basic self-care tasks and had a tendency to be too trusting of strangers. SM had some behavioral issues, as reported by sibling's father during two weekend visits, she had inappropriate conversations and she was defiant and isolated herself after visits with mother.

*Case Plan Progress*

**{¶ 37}** Mother showed insufficient improvement with respect to: her illicit substance use, as she continued to test positive for drugs despite treatment; her living environment, as there were still bugs, and some areas of the house were cluttered and

14.

filthy; and, her mental health, as she had attended counseling sessions and IOP, but was often late or was a no call-no show, and she refused to attend inpatient treatment.

**Case Plan/Semi-Annual Review Report/GAL Report**

{¶ 38} On June 9, 2023, a case plan was filed with one concern, that SM was in need of permanent placement through adoption.

{¶ 39} On August 1, 2023, the agency filed its semi-annual administrative review report which set forth the same two concerns with mother as set forth in the previous report: household environmental hazards; and, mother's substance abuse.

{¶ 40} On August 21, 2023, the GAL filed a report for the upcoming trial, which included the following: SM completed kindergarten with almost all outstanding marks; SM only missed school due to her oral surgeries; SM played T-ball and was one of the best hitters on the team; mother lived in the same house with the same people; the GAL's last home visit was July 12, 2023, and she was met on the porch by MG's fiancé who said mother was not there; MG then came out of the house and reported that mother had telemedical visits with the psychiatrist, but was not involved with inpatient chemical dependency treatment or IOP; MG said they were looking for different housing but could not afford anything; the car was impounded because MG drove it without having a license; thereafter, the GAL went back to her car to write notes, and saw mother and her boyfriend come out of the house, thus mother was there the entire time; the social worker went to the house three times in July to meet with mother but was unsuccessful; the social worker knew of no negative drug tests for mother in 2023; mother's visits with SM went

15.

well; and, SM expressed that she would be sad if she could no longer visit mother, but SM acknowledged some of the safety issues at mother's house like the cockroaches, which made SM itch, mother's inability to afford to get the cats fixed, so the cats kept having kittens, and mother could not afford to buy SM a tablet. The GAL recommended that SM be placed in the permanent custody of the agency, and SM continue with mental health services as long as the counselor deems it necessary.

{¶ 41} On September 11, 2023, the permanent custody trial was held; mother attended but SM's father did not. On September 20, 2023, the juvenile court issued its judgment entry granting permanent custody of SM to the agency. Mother appealed.

### Permanent Custody Law

{¶ 42} R.C. 2151.353 provides in relevant part:

(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

* * *

(4) Commit the child to the permanent custody of a public children services agency * * * if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child.

**{¶ 43}** The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) the child's best interest is served by granting permanent custody to the agency. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 12. Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**First Prong**

**{¶ 44}** The relevant provisions of R.C. 2151.414(B)(1) state:

[T]he court may grant permanent custody of a child to a movant if the court determines * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a consecutive [22]-month period * * *, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

17.

* * *

(d) The child has been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a consecutive [22]-month period, or the child has been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a consecutive [22]-month period * * *.[8]

{¶ 45} When calculating "12 of 22" time, the operative ending date is when the agency's motion for permanent custody was filed. *In re A.C.*, 9th Dist. Summit No. 23090, 2006-Ohio-3337, ¶ 11-12, citing *In re C.W.*, 104 Ohio St.3d 163, 818 N.E.2d 1176, 2004-Ohio-6411, ¶ 24 ("'[A] motion for permanent custody must allege grounds that currently exist.' *In re K.G.*, [9th Dist. Wayne No. 03CA0066,] 2004-Ohio-1421[,] * * * ¶ 13. A juvenile court lacks authority to grant an agency's motion [on "12 of 22"] grounds if those grounds were not satisfied when the motion was filed.").

{¶ 46} R.C. 2151.414(E) sets forth the elements necessary to satisfy a determination under R.C. 2151.414(B)(1)(a), that the child cannot or should not be placed with either parent within a reasonable time. *See In re Schaefer*, 111 Ohio St.3d 498,

---

[8] The "12 of 22" provision is found in both R.C. 2151.414(B)(1)(d) and R.C. 2151.413(D)(1), and the agency set forth the latter statute as one of the bases under which it sought permanent custody of SM.

18.

2006-Ohio-5513, 857 N.E.2d 532, ¶ 38.  The relevant provision of R.C. 2151.414(E)(2)[9] states:

> In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines, by clear and convincing evidence, at a hearing held * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> * * *
>
> (2) Chronic * * * chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section * * *[.]

**Second Prong**

{¶ 47} This prong concerns the best interest of the child, and when the juvenile court is making this determination, R.C. 2151.414(D)(1) provides that all factors which are relevant shall be considered by the court, including, but not limited to:

---

[9] We note the court cited to R.C. 2151.414(B)(2), but the court's language tracks R.C. 2151.414(E)(2).  Thus, it appears that the court's citation is a typographical error.

(a) The interaction and interrelationship of the child with the child's

parents, siblings, relatives, foster caregivers and out-of-home providers, and

any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through

the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether

that type of placement can be achieved without a grant of permanent

custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section

apply in relation to the parents and child.

### Permanent Custody Trial

{¶ 48} Four witnesses were called to testify; their testimony is summarized below.

**Joseph Asberry**

{¶ 49} Mr. Asberry testified he is an ongoing caseworker for the agency, assigned to SM's family in February 2022. The children had already been removed from mother's house and placed together in a foster home. A case plan with reunification as the goal was established for mother to address her substance abuse and the children's failure to attend school, and services outlined for mother were a mental health assessment and parenting classes. She underwent an assessment; mental health counseling and substance abuse treatment were recommended.

20.

**{¶ 50}** Asberry visited mother at the family home, and initially, the house was pretty dirty, there were a lot of bugs, and there was a strong foul odor from trash and animal excrement. Also, there was clutter throughout the house, with stuff stacked up high, and occasionally there was trash piled up outside of the house. Mother lived at the house with three other relatives. During the case, progress was made cleaning and decluttering the house, but there was still a foul odor, there were a lot of bugs, including cockroaches, on the ceilings, kitchen counters and crawling on the walls, and flies in the trash. At one visit, Asberry noticed a gaping hole in the bathroom floor; that hole was repaired.

**{¶ 51}** The agency provided mother with applications for medical assistance, food and cash, as well as PRC,[10] so she could get financial help, but she never completed the applications. For the entirety of the case, mother had no job and no driver's license.

**{¶ 52}** Mother's supervised visit with SM went well, they were happy to visit each other and had a bond. At the weekly visits, which lasted two hours, mother and SM played games, ate, talked and caught up with each other.

**{¶ 53}** Regarding case plan services, mother attended parenting classes in which she was pretty engaged and seemed to learn about enforcing rules and setting boundaries around the house; she successfully completed parenting classes. She also attended

---

[10] PRC paid for visitations, parenting classes and other services. Without a completed application, the parent had to self-pay for the services.

counseling and substance abuse treatment, and although she was often late, she was pretty active and engaged during sessions.

{¶ 54} In or about February 2023, Asberry and the GAL suggested that mother go for more intensive drug treatment because she still tested positive for high levels of meth, but mother did not see the need. In or about June 2023, mother was advised by her counselor to seek inpatient treatment, but mother was not willing to go. About 15 drug tests were given to mother, and the results were positive for THC, amphet and high levels of meth.

{¶ 55} On August 18, 2023, at an unannounced visit, mother was drug-tested and the results were positive for meth, amphet and THC. She said she was taking Wellbutrin which may cause her to test positive for meth, but Asberry learned that was not possible. At the time of trial, mother was going to a doctor for Wellbutrin but was not participating in any drug counseling or treatment, as the facility where she went closed a few months earlier, so she was looking for a new facility. Asberry told mother to call him if she needed help finding a new facility or needed a referral, but mother never called.

{¶ 56} Asberry saw SM's father one time, at a virtual court hearing. When Asberry was looking for permanency options for SM, he left voicemails for father and sent a letter, but received no response. Asberry contacted father's mother, PK, for a possible placement for SM, as SM was pretty familiar with PK. A home study was conducted and PK was approved. Asberry called PK, over a four-month period, to

22.

arrange visits between PK and SM, but PK ceased answering calls and never responded to Asberry.

{¶ 57} Mother suggested the relatives with whom she lived as possible placements for SM, but the agency did not think they were suitable caregivers for SM given they all lived in the dirty, cluttered house before the agency became involved, and they failed to intervene to clean or declutter the house or get the children to school.

{¶ 58} During the case plan, Asberry had contact with SM every month and noted that she made progress. SM attended counseling on a regular basis to deal with her separation from mother, and SM started trauma therapy and grief counseling, as SM was diagnosed with PTSD. After SM was placed in the second foster home, her dental issues were addressed - she had multiple teeth filled, capped or pulled. SM had to be placed in the second foster home because her first foster parents were no longer fostering children. SM was pretty bonded with her second foster family, and they wanted to adopt her.

{¶ 59} At the time of trial, SM had been out of the family home for about a year and nine months, and she still had a bond with mother. SM expressed she would like to live with mother, or at least continue to see her mother. Asberry noted that sibling was in a residential treatment facility in Franklin County, Ohio

{¶ 60} Mother indicated to Asberry, for quite a few months, that she wanted to get her own place. She was recently approved for $800 per month for housing and was on a waiting list for an apartment for a month or so, she said. Asberry observed this was the first real step that mother had taken which demonstrated she was getting her own place.

23.

**Troy de Hagen**

{¶ 61} Mr. de Hagen testified he was a certifying scientist for Forensic Fluids Laboratories ("FFL"), located in Michigan. He earned bachelor's of science degrees in biochemistry and biomedical science, a bachelor's of arts degree in philosophy, and a master's degree in chemistry. In 2022, he became certified by the National Registry of Certified Chemists as toxicological chemist.

{¶ 62} The procedure for receiving and processing drug screens at FFL was described by de Hagen, which included chain of custody paperwork with prescribed medications listed for the donor. If a drug screen was negative, a negative report would be generated. If a drug screen was positive, it was considered a presumed positive and the screen would be submitted for secondary, confirmation testing. If that screen was confirmed positive, the concentration of the drug was quantified and a report was generated. The types of machines and maintenance of the machinery at FFL, as well as proficiency testing for the machines, was discussed by de Hagen.

{¶ 63} With respect to mother's August 18, 2023 drug screen which was positive for meth, de Hagen testified that Wellbutrin would not cause a false positive for meth because the drugs have uniquely different chemical structures. Moreover, the drug screen was tested to detect a class of compounds, which would include meth but not Wellbutrin. This same reasoning also applied to the positive test results for amphet and THC.

24.

**Mary Ann Lamb**

{¶ 64} Ms. Lamb testified she was the court-appointed GAL for SM, and she met with SM once a month throughout the case at the two foster homes. SM was energetic and social, she liked school, people, sports, playing on the swings and riding her bike, she enjoyed visits with mother, she got along well with her foster brothers, she loved to show Lamb her room and the foster home, and she seemed to really enjoy the family setting at her foster home, which was located in a nice neighborhood.

{¶ 65} While at the foster homes, SM did really well in school, her attendance was very good and she only missed school when she had dental surgeries and an occasional cold. SM's health was good and her relationships in the foster homes were good. The social media and entertainment which SM viewed had changed, as it was monitored at the foster homes, so SM does not refer to inappropriate programs and concepts.

{¶ 66} Lamb observed three supervised visits between SM and mother, where they would color or play games and SM would always play on mother's phone. Mother brought food to the visits. Lamb believed mother and SM were bonded.

{¶ 67} Lamb saw mother for visits, announced and unannounced, at the family home; in 2022, there were six visits, and in 2023, three visits. Lamb observed that everyone in the home really struggled to keep it tidy and uncluttered and there were a lot of bugs. The first few times Lamb was in the family home, she was not able to go into mother's bedroom, but Lamb insisted on seeing it. Mother's bedroom smelled like

25.

marijuana, her bed just had a bare, dirty mattress with dirty blankets, and there was a toddler bed for SM with stuff on it so it could not be used as a bed.

{¶ 68} Mother's aunt and her fiancé were at the family house three times when Lamb visited, but Lamb was unable to see their bedroom as the door was locked. Lamb was told when SM lived at the house, SM slept in that bedroom. Lamb also saw at the house: MG, who lived in the house; MG's fiancé; and, mother's (at one time) fiancé. MG said she received $800 a month from social security and she was trying to find a place of her own, and have mother and the children live there, but MG could not find a four-bedroom residence for $800/month.

{¶ 69} Lamb described the dynamics between mother and the other household members as strange. Mother saw herself as in charge, and kind of dominated the household, but in reality, since it was not her home, she did not have authority over it. For example, several times when Lamb was visiting, mother saw a bug on the floor and told MG to "take care of your friend over here," and MG got rid of the bug. Lamb remarked that mother "doesn't take authority to really, to have a household of her own so she can really * * * give a healthy environment for the kids."

{¶ 70} The month before trial, 19 months into the case, mother received a voucher for housing, she inquired about an apartment and was told there was a month's wait.

{¶ 71} Lamb's last visit at the family home was September 8, 2023, and in the kitchen, she counted about a dozen cockroaches and saw many flies and ants around the animals' dishes. The house definitely had a smell of urine, grease and things that were

26.

absorbed over time - it was not a pleasant smell. There were cats in the house and a dog. Lamb noticed the outside of the house had improved as the garbage was picked up.

{¶ 72} With respect to employment, mother did not want to leave the house to work due to her social anxiety, and she did not want to be around people. She tried jobs through the internet, but she did not obtain a job with sufficient income for herself, let alone her children. Lamb did not know of any job mother had at the time of trial.

{¶ 73} At some point in time, mother mentioned to Lamb that she was taking some medical coding classes, but Lamb did not know where mother was in the process.

{¶ 74} Concerning counseling, mother had not been involved in substance abuse counseling since before July 2023, which was troubling to Lamb since mother had not submitted a negative drug screen in 2023, and all screens were positive for meth.

{¶ 75} Lamb observed that mother participated in nine out of thirteen parenting classes, which qualified as completing the classes.

{¶ 76} Lamb never met SM's father and had no identifying contact information for him.

{¶ 77} Lamb authored a report, filed August 21, 2023, in which she recommended that it was in SM's best interest for permanent custody to be awarded to the agency. Lamb did not believe SM could safely be placed with mother due to her drug use and the state of the family home. Although SM wanted to live with mother, Lamb opined it was in SM's long-term best interest to be placed in the permanent custody of the agency, and be adopted by her foster parents. Lamb thought SM was resilient. Lamb noted the

27.

change from the first foster home to the second was difficult for SM, as SM had nightmares about drowning and people dying, which was why the foster parents sought counseling for SM. However, Lamb did not hear, in the past four or five months, that SM had nightmares. Other topics discussed in counseling included SM's relationship with her foster parents and SM's feelings about coming back and forth from visits with mother.

**Foster Parent**

{¶ 78} SM's foster mom, KD, testified that SM had lived in her home since December 2022, and the household also included KD's husband, whom she married in 2012, and their two sons, six and four. They lived in a three-bedroom ranch home where SM has her own bedroom. KD worked for children services in Lorain County, Ohio, as a direct services caseworker, and her husband was a stay-at-home dad.

{¶ 79} When SM entered the home, she had poor eyesight, her teeth were in very bad condition, she was very friendly but also very friendly to strangers, which showed she did not quite understand boundaries, and her emotions fluctuated but she was pretty good at expressing how she felt. KD signed up SM for counseling, and KD scheduled a vision appointment for SM, and SM got glasses.

{¶ 80} In February 2023, SM was able to have her dental surgery and had five teeth extracted, five teeth capped and a couple of fillings. Thereafter, SM could eat anything. Before surgery, SM struggled to eat, as it was painful when she chewed.

28.

{¶ 81} KD described SM as very smart and noted that when SM started kindergarten, the teacher expressed how intelligent SM was and that she was one of the best students in class. SM's report card was always outstanding and the school always indicated how pleasant SM was to be around.

{¶ 82} KD enrolled SM in a dance and martial arts program, and SM tried dance, kung fu and gymnastics in the wintertime. In the spring and summer, SM was in baseball.

{¶ 83} Over the winter, KD thought SM struggled with divided loyalties and felt she had to choose between her foster family and mother. However, with counseling and help from KD and her husband, who told SM repeatedly that it was ok for her to love more than one person and it was ok for her to have lots of love in her life, KD noticed a change in SM during the summer such that SM was not angry or anxious. KD said SM did not act out, and described SM's demeanor as positive and excited about everything going on. KD noted SM was in touch with her feelings and expressed she felt sad when it was discussed that she may not go back to mother, but SM also expressed hope that she would be ok. KD thought SM processed everything as well as a 7-year-old could.

{¶ 84} KD and her husband would like to adopt SM if she could not return home to mother, and they would like to explore how SM could stay in contact with mother and her family, as SM loved them.

**{¶ 85}** KD's contact with mother was positive and appropriate, before and after mother's visits with SM, and at SM's T-ball practice. KD had no contact with SM's father.

**Exhibits**

**{¶ 86}** The agency offered into evidence two exhibits, with no objections: Exhibit A - drug test results from August 18, 2023 drug screen; and, Exhibit B - GAL report filed on August 21, 2023.

## Juvenile Court's Judgment

**First Prong of Permanent Custody Analysis**

**{¶ 87}** The court found, by clear and convincing evidence, R.C. 2151.414(B)(1)(a) applied, that SM cannot or should not be placed with either of her parents within a reasonable time, as mother's chemical dependency was so severe that she was unable to provide SM with an adequate permanent home currently, and within the next year.[11] The court set forth: mother submitted about 15 drug screens, all of which were positive for meth, including a drug screen given in August 2023; mother's counselor recommended that she go to inpatient treatment, but mother refused; mother was not participating in any treatment; she remained unemployed; and, she continued to reside in the same home with three other adults, where some improvements were made, but foul odors and clutter remained. The court also noted that mother completed parenting classes.

---

[11] Again, the court cited to R.C. 2151.414(B)(2), which appears to be a typographical error for R.C. 2151.414(E)(2).

**{¶ 88}** The court further found, pursuant to R.C. 2151.414(B)(1)(d), that SM had been in the temporary custody of the agency for nearly 17 consecutive months when the agency filed its motion for permanent custody.

**Second Prong of Permanent Custody Analysis**

**{¶ 89}** As to the child's best interest, the court considered the relevant factors in R.C. 2151.414(D)(1)(a) through (e) in reaching its determination, and made findings based on clear and convincing evidence in the record.

**{¶ 90}** Regarding (D)(1)(a), the court considered SM's interactions and relationships with mother and others, and found: SM was bonded with her foster family, which included foster mom and dad and two children; SM was bonded with mother; mother's visits with SM were mainly supervised and were appropriate; and, SM's father did not participate at trial and his position about the pending motion was unknown.

**{¶ 91}** With respect to (D)(1)(b), the court considered SM's wishes and found that SM expressed a desire to return to mother's home, or at least continue to see her, and foster mom indicated a willingness for SM to continue to have contact with mother, if foster mom and dad adopted SM. The court further found that the GAL recognized the sadness SM would experience if mother's parental rights were terminated, but the GAL believed the best result for SM long-term would be for her to be placed in the agency's permanent custody, as that was in SM's best interest.

**{¶ 92}** Regarding (D)(1)(c), the court considered SM's custodial history and found: SM was placed in GG's legal custody in 2018, when mother was in prison; after

31.

mother was released from prison, she returned to the family home; SM was removed from the home in January 2022; mother was a part of the circumstances and environment which led to the agency's involvement and the finding that SM was dependent; and, SM had been in the temporary custody of the agency for nearly 20 consecutive months at the time of trial.

{¶ 93} With respect to (D)(1)(d), the court considered SM's need for a legally secure permanent placement and whether that could be achieved without a grant of permanent custody to the agency, and found: the case will "sunset in 4 months" and mother still used meth and was not in treatment; SM thrived in her foster home; foster mom arranged for dental and optical care for SM, and enrolled her in mental health treatment to address the distress from being removed from home; SM was excelling in school, exhibited good behavior and her attendance dramatically improved; SM was involved in dance, martial arts and baseball; SM was able to meaningfully express her feelings to her foster mom; and, foster mom and dad would like to adopt SM.

{¶ 94} With respect to (D)(1)(e), the court found that none of the factors in R.C. 2151.414 (E)(7) to (11) applied.

{¶ 95} The court found the agency made reasonable efforts to finalize SM's permanency plan through supportive services, and the agency made reasonable efforts to: prevent or eliminate the need for SM's removal from the home; eliminate SM's continued removal from the home; make it possible for SM to return home safely; or, place SM in a timely manner in accordance with the case plan in the record.

32.

**{¶ 96}** The court ordered that SM be placed in the permanent custody of the agency, and further ordered that an adoption plan be implemented for SM.

## Assignment of Error

**{¶ 97}** Mother argues that the trial court's decision to terminate her parental rights and responsibilities was not supported by clear and convincing evidence, and was against the manifest weight of evidence presented at trial.

**{¶ 98}** With respect to the court's finding under R.C. 2151.414(E)(2), mother submits that she admitted to her substance abuse and addiction, and she frequently sought treatment. She asserts the agency failed to show, by clear and convincing evidence, that she would not be able to provide an adequate home for SM within one year.

**{¶ 99}** Mother contends that of the 15 drug screens referenced by the court, only one positive drug screen was submitted into evidence. She further claims the agency failed to demonstrate that, due to her not completing substance abuse counseling, she was not capable of caring for the children, as no testimony was presented to indicate that any of her substance abuse issues (that she may or may not currently have) would affect SM and prevent SM from being returned home. Mother argues the agency simply presumed that since she failed to complete substance abuse counseling, she was chemically dependent and unable to care for SM. Mother insists no testimony was presented that she had ever been high or appeared to be under the influence during any meeting, visit or other event.

33.

{¶ 100} Mother observes that caseworker Asberry testified that she had taken steps to obtain her own housing, but he discounted this as only "the first real step that's demonstrated her getting her own place." Mother submits the court was presented with testimony that she had taken steps to secure safe and stable housing for herself and SM, thus, the evidence was not clear and convincing that, due to mother's chemical dependence, she would not be able to provide an adequate home for SM within one year of the date of the trial.

**Best Interest Factors**

{¶ 101} Mother argues the agency failed to meet its burden to prove, by clear and convincing evidence, that it was in SM's best interests to be placed in the agency's permanent custody. Mother notes the court acknowledged that SM was well bonded with mother, visits were appropriate, and SM expressed a desire to return to mother's home or have the ability to continue to see mother. Mother further notes that foster mom testified SM directly told foster mom that she would like to be returned to mother's care, SM often expressed that she missed mother, and SM talked about other members of the family. Mother also observes that the GAL testified if SM got to choose, she wanted to reside with mother, and the GAL had a concern that the severance of mother's parental rights would have a negative impact on SM.

{¶ 102} Mother asserts the trial court appeared to only balance its best interest decision on a comparison of the foster family to mother's assumed life, and the court even said that none of the R.C. 2151.414(E)(7) - (11) factors applied. Mother does not

34.

dispute that SM has improved while with the foster family, but argues that it is not enough to simply show one is better than the other when it comes to the permanent termination of parental rights and responsibilities.

{¶ 103} Mother offers other best interest factors which should have been considered and given their fair weight, like her bond with SM, SM's wishes, and the foster mom's testimony about SM and mother's interactions. Mother also notes she continued to visit with SM.

{¶ 104} The agency counters that the juvenile court's finding, by clear and convincing evidence, was not against the manifest weight of the evidence, and the court's award of permanent custody is reviewed for an abuse of discretion.

{¶ 105} The agency notes that the family home was dirty, had bugs, animal urine and feces, and smelled, and continued to have a lot of bugs on the ceiling, walls and counters, and still had a foul odor. The agency observes that mother was unemployed throughout the case, and although inpatient treatment was recommended, she was not willing to follow through. The agency asserts there were no suitable relative placements for SM, as mother's relatives who lived in the family home could have intervened on SM's behalf by getting SM to school, seeking dental care for SM and cleaning the house.

{¶ 106} The agency further argues the juvenile court considered all of the factors in R.C. 2151.414(D)(1), and found, by clear and convincing evidence, that placing SM in the permanent custody of the agency would be in her best interest, and the foster parents expressed the desire to adopt SM.

35.

{¶ 107} Mother sets forth the standard of review is manifest weight of the evidence, while the agency refers to two standards of review: manifest weight and abuse of discretion.

{¶ 108} A review of the law shows that in *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 1, the Supreme Court of Ohio held that "the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights * * * are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards." The appropriate standard to apply depends on the nature of the arguments presented by the parties. *Id.* at ¶ 11.

**Standards Defined**

{¶ 109} Sufficiency of the evidence is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*

{¶ 110} Manifest weight of the evidence "'depends on [the evidence's] effect in inducing belief.'" (Emphasis deleted.) *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990). When reviewing for manifest weight, the appellate court weighs the evidence and all reasonable inferences, considers the witnesses' credibility and decides whether, in resolving evidentiary conflicts, the judge lost his way and created a manifest miscarriage of justice such that the judgment must be reversed and a new trial

36.

ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

**Analysis**

**{¶ 111}** At the outset, we note that mother did not set forth any arguments regarding the juvenile court's finding that R.C. 2151.414(B)(1)(d), the "12 out of 22" provision, applied. As such, we are not required to review this finding; however, we choose to examine it, applying the sufficiency of the evidence standard.

**{¶ 112}** We note the basis for a finding that R.C. 2151.414(B)(1)(d) applies is that "[t]he child has been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a consecutive [22]-month period[.]" As set forth above, a motion for permanent custody must allege grounds which existed at the time the motion was filed.

**{¶ 113}** Here, the record shows that the agency was granted temporary custody of SM on January 20, 2022, and the motion for permanent custody was filed on June 7, 2023; that period of time was not 22 months, so the agency had no basis to move for permanent custody of SM under the "12 out of 22" provision. We therefore find the juvenile court's ruling that the "12 out of 22" provision applied is not supported by sufficient evidence.

**{¶ 114}** With respect to mother's arguments concerning the juvenile court's decision that R.C. 2151.414(B)(1)(a) applied, and that SM could not and should not be

placed with either parent within a reasonable time, we find the nature of her arguments are such that the manifest weight of the evidence standard applies.

{¶ 115} Upon review of the juvenile court's judgment entry, the court summarized the facts and evidence presented and indicated the factors it considered in reaching its decision to grant permanent custody of SM to the agency, thereby terminating mother and father's parental rights to SM. Based on our review of the entire record, we find this is not the exceptional case in which the trier of fact clearly lost his way and created a manifest miscarriage of justice by finding permanent custody was in SM's best interest.

{¶ 116} The record shows the agency removed SM and sibling from the family home because the children were not attending school. This was despite their legal guardian, mother and several other adults living in the three-bedroom home. While conducting visits at the home, caseworker Asberry and the GAL were concerned with the unsanitary, bug-infested house which was also cluttered and had a foul smell.

{¶ 117} The record further shows that in spite of the services offered by the agency to assist mother in remedying the issues which caused SM's removal and continued removal from the home, mother failed to make significant progress in those services.

{¶ 118} Throughout the case, mother occasionally complied with some case plan goals but ultimately, the only case plan services that she successfully completed was the parenting program. Mother also consistently visited with SM and the visits went well. However, mother failed to follow and comply with the recommended mental health and

38.

substance abuse treatment plans, as she did not consistently attend counseling sessions, she refused to go for inpatient treatment, and her drug screens were all positive, and almost all of mother's screens were positive for meth. The record shows that prior to this case, mother went to prison for aggravated possession of drugs.

{¶ 119} Further, during the case, mother failed to keep the house clean and uncluttered, as the house was still infested with bugs and it smelled, and she never had a job which could sustain her, much less the children. In addition, we note that mother never had a driver's license, she never filled out paperwork to receive financial assistance, and until right before trial, she had never taken steps to secure housing of her own.

{¶ 120} After SM was removed from the family home and placed into foster care, she received much-needed dental care, she was prescribed glasses, she attended school regularly and received very good report cards. In her foster homes, SM lived in safe, sanitary environments with foster parents who ensured her physical and emotional needs were met. SM thrived in foster care, and was bonded with her current foster family, and still loved her first foster family. SM also loved and was bonded with mother.

{¶ 121} In her current foster home, SM had the opportunity to play sports and participate in dance, kung fu and gymnastics. SM's current foster parents recognized SM's desire to maintain a relationship with mother and relatives, and if they adopt SM, they would explore how SM could stay in contact with mother and relatives.

39.

{¶ 122} SM wished to return to mother's home, but the GAL opined in her last report that permanent custody was in SM's best interest. We note in each of the reports filed by the GAL, she detailed her visits with mother and with SM, and set forth a comprehensive description of the events which occurred, or had not occurred, with mother and SM at particular times throughout the case. The GAL also indicated that she never met SM's father and had no identifying contact information for him.

{¶ 123} The record reveals that SM's father had no contact with SM since she was one year old, and he only participated in the case briefly, at the very beginning.

{¶ 124} For the reasons above, we conclude the juvenile court's judgment that pursuant to R.C 2151.414(B)(1)(a) and R.C. 2151.414(E)(2), SM cannot and should not be placed with either parent within a reasonable period of time, and pursuant to RC. 2151.414(D)(1)(a) through (d), an award of permanent custody to the agency was in SM's best interest is not against the manifest weight of the evidence.

{¶ 125} We further conclude that while the juvenile court erred in finding, pursuant to R.C. 2151.414(B)(1)(d), that SM had been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period, this error is harmless, as there is an abundance of evidence in the record to support the court's finding under R.C. 2151.414(B)(1)(a).

{¶ 126} Accordingly, we find mother's sole assignment of error not-well taken.

{¶ 127} On consideration whereof, the judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.           _____
                                                JUDGE
Gene A. Zmuda, J.

                                 _____
Myron C. Duhart, J.                          JUDGE
CONCUR.

                                 _____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.